UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:17-cv-22237-KING/BECERRA

MAZHARUL ISLAM,

      Plaintiff,

v.

KEVIN MCALEENAN, in his capacity as
Acting United States Secretary of
Homeland Security, *et al.*,

      Defendants.[1]

_____/

## REPORT AND RECOMMENDATION
## ON CROSS MOTIONS FOR SUMMARY JUDGMENT

**THIS CAUSE** came before the Court upon Defendants' Motion for Summary Judgment,

ECF No. [19], and Plaintiff Mazharul Islam's Cross Motion for Summary Judgment, ECF No.

[22].[2]  Plaintiff and Defendants have filed their respective Responses, ECF Nos. [22], [26], but

only Defendants filed a Reply, ECF No. [25].  The parties' motions are now ripe for disposition.

After careful review of the motions, the relevant authorities, the record, and for the reasons

discussed below, the undersigned **RECOMMENDS**[3] that Defendants' Motion for Summary

---

[1] Although this case is styled "Islam v. Kelley et al." in the electronic docketing system, Mr. McAleenan is the current Acting United States Secretary of Homeland Security.  The Court has therefore incorporated Mr. McAleenan's name in the above style.  *See* Fed. R. Civ. P. 25(d).

[2] Plaintiff's Cross Motion for Summary Judgement is docketed at ECF No. [23], but the Motion is found at ECF No. [22].

[3] The Honorable James Lawrence King, United States District Judge, referred this case for all necessary and proper action as required by law, with respect to any and all pretrial matters.  ECF No. [17].

Judgment, ECF No. [19], be **GRANTED**, and that Plaintiff's Cross Motion for Summary Judgment, ECF No. [22], be **DENIED**.

## I.    UNDISPUTED FACTS[4]

Plaintiff Mazharul Islam ("Islam") is a native and citizen of Bangladesh.  ECF Nos. [19-1] ¶ 1, [18-1] at 17, 28, 30.  On December 12, 2011, Islam entered the United States without inspection and was subsequently apprehended by the U.S. Border Patrol.  ECF Nos. [19-1] ¶ 1, [18-8] at 62–64.  On January 4, 2012, Islam made a sworn statement to a United States Citizenship and Immigration Services ("USCIS") Asylum Officer indicating that he was a member of the Bangladesh Nationalist Party ("BNP").  ECF Nos. [19-1] ¶ 1, [18-8] at 56.  Islam stated that he had been assaulted in 1997 and in 2011 by members of the Awami League ("AL"), a rival political party to the BNP, because of his association with the BNP.  ECF Nos. [19-1] ¶ 1, [18-8] at 55–56.  Pursuant to the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158, the Asylum Officer determined that Islam had a credible fear of returning to his native country based upon past persecution.  ECF Nos. [19-1] ¶ 1, [18-8] at 51.  The Asylum Officer also determined that Islam did not "appear to be subject to a bar(s) to asylum or withholding of removal."  ECF No. [18-8] at

---

[4] Defendants submitted a Concise Statement of Material Facts, ECF No. [19-1], pursuant to Federal Rule of Civil Procedure 56(c), and Southern District of Florida Local Rule 56.1(a).  Plaintiff failed to controvert Defendants' Concise Statement of Material Facts as required by the Local Rules. Local Rule 56.1(b) provides: "[a]ll material facts set forth in the movant's statement filed and supported as required above ***will be deemed admitted*** unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record." S.D. Fla. L.R. 56.1(b) (emphasis added).  Because the Court finds that Defendants' Concise Statement of Material Facts, ECF No. [19-1], is supported by the Certified Administrative Record, ECF No. [18], and has not been controverted, it is deemed admitted and incorporated in this section.  *See Kefeenie v. Gloria Martin Tr.*, No. 17-24346-CIV-GAYLES/OTAZO-REYES, 2018 WL 4301558, at *4 (S.D. Fla. Sept. 10, 2018) ("Plaintiff has failed to properly controvert the Trust's Statement and, therefore, pursuant to Local Rule 56.1(b), all facts contained within that Statement are hereby deemed admitted.").

51. Accordingly, Islam was placed in removal proceedings and permitted to apply for a full hearing on his application for asylum.  ECF No. [19-1] ¶ 1.

On August 2, 2012, in accordance with 8 U.S.C. § 1158, Islam filed an application for asylum and for withholding of removal.  ECF Nos. [19-1] ¶ 2, [18-6] at 17–31.  According to evidence submitted with Islam's Form I-589, he became a member of the Chatra Dal (the student wing of the BNP) in 1995.  ECF Nos. [19-1] ¶ 2, [18-6] at 58.  During his time in the Chatra Dal, Islam attended meetings and demonstrations.  ECF Nos. [19-1] ¶ 2, [18-6] at 27.  In January 2001, he became a member of the BNP.  ECF Nos. [19-1] ¶ 2, [18-6] at 54.  From 2001 to 2011, Islam owned a small tea shop, which he routinely used as a meeting place for the BNP.  ECF Nos. [19-1] ¶ 2, [18-6] at 28.  Islam also posted flyers on behalf of the BNP.  ECF Nos. [19-1] ¶ 2, [18-6] at 27.  On August 1, 2011, Islam became the Publicity Secretary for the local BNP organization.  ECF Nos. [19-1] ¶ 2, [18-6] at 28.  As Publicity Secretary, Islam was responsible for putting up posters in the local area that advertised BNP-sponsored events.  *Id*.

There was no evidence introduced or argument raised at the 2013 asylum hearing regarding whether BNP was a terrorist organization.  ECF No. [19-1] ¶ 13 n.12.  On November 12, 2013, an Immigration Judge issued a one-page order granting asylum to Islam.  ECF Nos. [19-1] ¶ 3, [18-1] at 29.  The Immigration Judge's order contains no mention of the terrorism inadmissibility bar.  ECF No. [19-1] ¶ 13 n.12, [18-1] at 29.

On January 13, 2015, Islam filed an I-485 Application to Register Permanent Residence or Adjust Status ("Application to Adjust Status"), pursuant to 8 U.S.C. § 1159 and 8 C.F.R. § 209.2.  ECF No. [19-1] ¶ 4.  Islam indicated on his Application to Adjust Status that he was a member of the BNP from 1995 to the present.  ECF Nos. [19-1] ¶ 4, [18-1] at 19.  On April 6, 2016, USCIS

sent Islam a Request for Evidence ("RFE").  ECF Nos. [19-1] ¶ 8, [18-1] at 39–40.  Specifically, the RFE requested additional details about Islam's involvement with the BNP.  *Id*.

Islam's response to the RFE indicated that as part of his involvement with the BNP, he disseminated written information about the BNP.  ECF Nos. [19-1] ¶ 8, [18-1] at 46.  Islam also encouraged people to vote for BNP candidates.  *Id*.  According to Islam, his only financial contribution to the BNP was a one-time registration fee.  *Id*.  Despite Islam's initial statement on his Application to Adjust Status that he was a member of the BNP from 1995 to the present, Islam responded that his involvement with the BNP ended around the end of 2013, but that he "did not make any official announcement about it."  *Id*.

On August 18, 2017, USCIS sent Islam a Notice of Intent to Deny ("NOID") his Application to Adjust Status because, pursuant to section 212(a)(3)(B)(vi)(III) of the INA, USCIS determined that during the time of Islam's involvement, the BNP and its youth and student organizations—the Jubo Dal and the Chatra Dal—met the definition of an undesignated terrorist organization.  ECF Nos. [19-1] ¶ 5, [18-2] at 24–32.  USCIS based its determination on publicly available sources, including: Human Rights Watch, ECF Nos. [18-3] at 4–31, [18-9] at 2–84, and the U.S. Department of State, ECF Nos. [18-2] at 91–100, [18-3] at 83–100.  ECF No. [19-1] ¶¶ 5–6.  USCIS also cited press accounts published in the *Daily Mail*, *The Guardian*, *Time*, and *Crisis Group*.  ECF No. [19-1] ¶ 7.  These publicly available sources indicated that the BNP had engaged in terrorist activities, which included the use of explosives during protests, setting fire to property during protests, and threatening journalists.  *Id*.

According to the NOID, Islam was inadmissible under section 212(a)(3)(B)(i)(I) of the INA for engaging in terrorist activities such as providing material support to the BNP by using his tea shop as a BNP meeting place, passing out BNP flyers, and putting up posters of events

sponsored by the BNP.  ECF Nos. [19-1] ¶ 9, [18-2] at 31.  Also, Islam was still a member of the BNP, which would render him inadmissible under section 212(a)(3)(B)(i)(VI) of the INA.  *Id*. Therefore, USCIS concluded that because Islam was inadmissible, he would not be eligible to adjust his status to legal permanent resident.  ECF Nos. [19-1] ¶ 9, [18-2] at 31–32.  Islam was given thirty (30) days (thirty-three (33) days if the notice was received by mail) to submit a rebuttal. ECF Nos. [19-1] ¶ 9, [18-2] at 32.

On September 11, 2017, USCIS received Islam's rebuttal.  ECF Nos. [19-1] ¶ 10, [18-5] at 9–13.  In his rebuttal, Islam stated that the BNP is not a Tier III undesignated terrorist group.  ECF Nos. [19-1] ¶ 10, [18-5] at 9–10.  Islam also stated that the acts of violence committed by BNP members were not sanctioned by the BNP.  *Id*.  Islam further stated that USCIS did not provide any evidence that demonstrated that the BNP or its leaders authorized, condoned, sanctioned, or tolerated violence or terrorism.  *Id*.  Islam explained that the Board of Immigration Appeals ("BIA"), in several of its decisions, had previously determined that the BNP was not a terrorist organization because the BNP party did not authorize violent activity.  *Id*.  Islam stated that the BNP's constitution, which Islam previously submitted to USCIS, condemns violence.  *Id*.

On October 18, 2017, USCIS issued a written decision denying Islam's Application to Adjust Status.  ECF Nos. [19-1] ¶ 12, [18-1] at 5–10.  USCIS found that during the time of Islam's involvement, the BNP and its youth and student organizations—the Jubo Dal and the Chantra Dal—fell within the definition of an undesignated terrorist organization in accordance with section 212(a)(3)(B)(vi)(III) of the INA.  ECF Nos. [19-1] ¶ 7, [18-1] at 7.  According to USCIS, multiple publicly available sources demonstrated that members of the BNP frequently engaged in terrorist activity, especially during protests, over a period of many years.  ECF Nos. [19-1] ¶ 11, [18-1] at

7–8.  The violence caused by members of the BNP resulted in "death, injury, and significant property damage."  ECF Nos. [19-1] ¶ 11, [18-1] at 8.

USCIS noted that there was no evidence to suggest that the BNP leadership took steps to prevent this violence or routinely held members accountable for committing those violent acts, which qualified as terrorist activity.  ECF Nos. [19-1] ¶ 11, [18-1] at 8.  Indeed, the BNP leadership has repeatedly called for protests, during which BNP members have engaged in terrorist activity, and have even participated in or threatened the use of violence.  *Id.*  These acts of violence by BNP members, coupled with the BNP leadership's encouragement, indicated to USCIS that the BNP leadership has at least tacitly authorized violence by its members.  *Id.*  Therefore, USCIS attributed the widespread and frequent terrorist activity carried out by members of the BNP over many years to the group and found that BNP qualified as a Tier III undesignated terrorist organization during the time of Islam's membership in the BNP.  *Id.*

USCIS further found that Islam was inadmissible under 8 U.S.C. § 1182(a)(3)(B)(i)(I) for having engaged in terrorist activities, namely, providing material support under 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd) to the BNP by using his tea shop as a BNP meeting place, passing out BNP flyers, and putting up posters of events sponsored by the BNP.  ECF Nos. [19-1] ¶ 12, [18-1] at 9–10.  Finally, USCIS determined that Islam was not eligible for the Secretary's discretionary exemption authority under 8 U.S.C. § 1182(d)(3)(B)(i).  ECF Nos. [19-1] ¶ 12, [18-1] at 10.

## II.   PROCEDURAL HISTORY

On June 15, 2017, while his Application to Adjust Status was pending, Islam filed a Complaint for Writ of Mandamus.  ECF No. [1].  Islam sought to compel USCIS to adjudicate his pending Application to Adjust Status.  *Id.* ¶ 1.  On October 19, 2017, Defendants moved to dismiss Islam's Complaint on the grounds that the Complaint had been rendered moot by the October 18,

2017 denial of Islam's Application to Adjust Status.  ECF No. [8].  Therefore, Defendants argued that the Complaint should be dismissed.  *Id.* ¶ 2.

On November 9, 2017, Islam filed an Amended Complaint for judicial review brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201.  ECF No. [12].  In his Amended Complaint, Islam raises several legal challenges to Defendants' denial of his Application to Adjust Status to legal permanent resident.[5]  *Id.* at 1.  First, Islam alleges that Defendants are "collaterally estopped" from denying his application to adjust status to legal permanent resident because when he was previously granted asylum, the Immigration Judge "necessarily" decided that he was not barred from admission.  *Id.*  Second, Islam alleges that even if 8 U.S.C. § 1182(a)(3)(B)(iv)(III) is to be applied, the BNP does not meet the definition of a Tier III "terrorist organization."  *Id.*  Third, Islam alleges that 8 U.S.C. § 1182(a)(3)(B)(vi)(III) is unconstitutionally vague, and was applied over-broadly in his case, in violation of the Fifth and Fourteenth Amendments.  *Id.*

Defendants then filed their Motion for Summary Judgment.  ECF No. [19].  Defendants contend that they were not collaterally estopped from applying the terrorism bar to Islam's Application to Adjust Status because they were required to determine whether Islam was admissible at the time of its filing and because they considered additional evidence that was not presented, considered, or relied upon at Islam's asylum hearing.  *Id.* at 2.  Moreover, Defendants argue that there is substantial evidence in the record to demonstrate that Islam was a BNP member from 1995 through 2015, during which the BNP was engaged in terrorist activity.  *Id.*  Defendants also contend that the terrorism bar is not unconstitutionally vague, nor has it been applied over-broadly to Islam.  *Id.*

---

[5] Islam reiterates these legal challenges in his Opposition to Defendants' Motion for Summary Judgment, Cross-Motion for Summary Judgment, and Request for Oral Hearing.  ECF No. [22].

## III.    LEGAL STANDARDS

Summary judgment is appropriate where there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists when "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986).  "For factual issues to be considered genuine, they must have a real basis in the record." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (citation omitted).  Speculation or conjecture cannot create a genuine issue of material fact sufficient to defeat a well-supported motion for summary judgment. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).  The evidence is to be viewed in the light most favorable to the non-moving party. *Augusta Iron and Steel Works, Inc. v. Emp'r Ins. v. Wausau*, 835 F.2d 855, 856 (11th Cir. 1988).

"However, even in the context of summary judgment, an agency action is entitled to great deference." *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996).  Under the APA, a court shall set aside an agency's action where it is arbitrary, capricious, or an abuse of discretion.  5 U.S.C. § 706(2)(A).  The arbitrary and capricious standard requires the court to consider whether an agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Sierra Club v. Johnson,* 436 F.3d 1269, 1273–74 (11th Cir. 2006) (quotation omitted).  Additionally, the Court must consider whether the agency has "articulate[d] a satisfactory explanation for [its] action including a rational connection between the facts found and the choice made." *Shays v. Fed. Election Com'n*, 414 F.3d 76, 97 (D.C. Cir. 2005) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).  The reviewing court is not to "conduct its own investigation

and substitute its own judgment for the administrative agency's decision." *Cobb's History*, 87 F.3d at 1246.  Rather, the court will "decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate APA standard of review." *Id.* (citation omitted).

## IV.   ANALYSIS

### A.   Collateral Estoppel Applies To USCIS' Adjudication Of Islam's Application to Adjust Status.

As a threshold matter, Defendants argue that collateral estoppel does not apply because 8 U.S.C. § 1159(b)(5) required USCIS to determine Islam's admissibility at the time of adjudicating his adjustment of status application.  ECF No. [19] at 10.  Defendants, however, concede that the governing statutes do not expressly contain a provision requiring that USCIS adopt particular preclusion principles.  *Id*.  Still, Defendants argue that it is apparent from the language and structure of the INA that Congress did not intend for administrative collateral estoppel to apply. *Id*. at 9–10.  Defendants emphasize that 8 U.S.C. § 1159(b)(5) required USCIS to determine Islam's admissibility "at the time of adjudicating" Islam's Application to Adjust Status.  *Id*. at 10. Defendants also assert that an application of collateral estoppel in this case would serve to limit the government's ability to manage its own docket and set reasonable limitations on its procedures. *Id*. at 11.  Islam does not offer any counter arguments.

The Court is unpersuaded by Defendants' arguments.  On the one hand, Defendants are correct that the INA envisions a two-step inquiry which evaluates applicants' admissibility to the United States both when they apply for asylum and when they apply for permanent residency. *Khan v. Johnson*, 160 F. Supp. 3d 1199, 1207 (C.D. Cal. 2016).  However, the fact that Congress intended for applicants to be evaluated twice does not necessarily mean that Congress intended to bar the application of collateral estoppel.  *Id*.  Indeed, the Supreme Court has held that there is a

presumption that Congress intended for well-established common-law principles, such as collateral estoppel, to apply to the decisions of administrative agencies. *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). This presumption applies "except when a statutory purpose to the contrary is evident." *Id.* "In other words, absent a legislative intent to the contrary, the Court should presume that common-law principles such as collateral estoppel, apply to the decisions of USCIS." *Khan*, 160 F. Supp. 3d at 1207.

Courts have specifically rejected Defendants' argument that Congress did not intend for collateral estoppel to apply because the statutory provisions governing adjustment of status require that petitioners be admissible at the time they apply to adjust their status to legal permanent residency. *Janjua v. Neufeld*, No. 15-cv-05475-EMC, 2017 WL 2876116, at *6 (N.D. Cal. July 6, 2017) ("[T]he Court rejects the government's contention that that Congress did not intend for collateral estoppel to apply to immigration proceedings, in particular, §§ 1158 and 1159."); *see also Islam v. U.S. Dep't of Homeland Sec.*, 136 F. Supp. 3d 1088, 1093 (N.D. Cal. 2015) (noting that statutory scheme creating two-step process involving the initial application for asylum and a separate adjustment of status is not indicative of the legislative intent to bar collateral estoppel). As the court explained in *Janjua*, "the requirement of § 1159(b)(5) simply reflects that new facts can arise or be discovered between the time an alien is granted asylum and the time that the alien asks for adjustment of his status from asylee to [legal permanent resident]." 2017 WL 2876116, at *5.

Accordingly, the Court finds that neither the plain language of sections 1158 and 1159, nor the statutory framework of the INA, indicate a congressional intent to bar the application of collateral estoppel. Having found that the doctrine of collateral estoppel, the Court next considers whether the requirements of that doctrine have been satisfied.

**B.    Defendants Are Not Estopped From Denying Islam's Application To Adjust Status.**

A party asking a court to apply the doctrine of collateral estoppel—also known as issue preclusion—must establish the following four elements: (1) that the issue at stake is identical to the one involved in the earlier proceeding; (2) that the issue was actually litigated in the earlier proceeding; (3) that the determination of the issue must have been a critical and necessary part of the earlier judgment; and (4) that the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue. *Madura v. Bank of Am., N.A.*, No. 17-15751, 2019 WL 1512874, at *2 (11th Cir. Apr. 8, 2019). The rationale behind collateral estoppel is the "obvious principle of judicial policy that a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise." *Astoria*, 501 U.S. at 107. To allow repeated claims on the same issue would drain judicial resources and overly burden parties who have already argued to final judgment successfully. *Id*. at 107–08.

*1.    The Issue At Stake In The Adjustment Of Status Proceeding Was Not Identical To The Issue In The Earlier Asylum Proceeding.*

The first requirement of collateral estoppel is that the issue decided in the earlier proceeding must be identical to the issue at stake in the later proceeding. The question for the Court here is whether the Immigration Judge and USCIS "relied upon the same facts and legal standard" in both proceedings. *See Khan*, 160 F. Supp. 3d at 1214. The Court finds that although the Immigration Judge and USCIS relied on the same legal standard, they did not rely on the same facts.

The Court agrees with Islam that the definition of "terrorist activity" is the same when adjudicating an application for asylum and an application for adjustment of status to legal permanent residence. Both sections 1158 and 1159 incorporate the definition of "terrorist

11

activities" set forth under 8 U.S.C. § 1182(a)(3)(B)(i). *Amrollah v. Napolitano*, 710 F.3d 568, 571 (5th Cir. 2013) ("In other words, both 8 U.S.C. § 1158 (the statute governing petitions for asylum) and 8 U.S.C. § 1159 (the statute governing petitions for permanent resident status), look to 8 U.S.C. § 1182 (the statute governing inadmissible aliens) to determine whether an alien is eligible for relief."). Therefore, the Court finds that the same legal standard applied in both proceedings in determining whether Islam was statutorily ineligible on the grounds that he had engaged in terrorist activity.

However, although the findings in the asylum proceeding and the adjustment of status proceeding relied on the same statute—8 U.S.C. § 1182—the Immigration Judge and USCIS did not rely upon the same facts. Looking at the record in the light most favorable to Islam, neither party presented any evidence or argument regarding Islam's alleged terrorist activities due to his affiliation with the BNP. It is undisputed that USCIS gathered additional evidence that was not presented or considered by the Immigration Judge who granted Islam asylum. ECF No. [19] at 16. Thus, it cannot be said that the Immigration Judge and USCIS relied on the same factual record.

Islam's contention that he never disputed his membership in the BNP misses the point. The issue is not whether he disputed or hid his membership in the BNP, the issue is whether the facts presented, either by him or USCIS, are the same. His claim that there is a "factual dispute" as to whether additional evidence was obtained after the completion of the asylum proceeding is incorrect. The record as to this point is clear—USCIS gathered additional evidence that was not presented to the Immigration Judge. Accordingly, the Court finds that Islam's asylum proceeding did not involve the same factual record as the adjustment of status proceeding where Islam's terrorist affiliation was in fact explored and considered. *See Montana v. United States*, 440 U.S.

147, 159 (1979) ("It is, of course, true that changes in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues."); *see also CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309, 1318 (11th Cir. 2003) ("Because we have concluded that the facts in this case are **materially different**, . . . preclusive effect is inappropriate . . . .") (emphasis added).  Indeed, cases where courts have found that the issues in both asylum and adjustment of status proceedings were the same, there were no "new facts" or they involved the "same factual record."  *See Khan*, 160 F. Supp. 3d at 1214 ("[B]oth the IJ and USCIS considered the same factual record when evaluating whether Khan was statutorily barred on the grounds of engaging in terrorist activity."); *see also Janjua*, 2017 WL 2876116, at *9 ("But in this case, the government has not pointed to any new facts since the grant of asylum that should be taken into consideration.").  Because USCIS considered new evidence regarding Islam's BNP activities that was not presented to the Immigration Judge, Islam has not met the first element of collateral estoppel.

> ## 2. *The Issue Of Whether Islam Engaged In Terrorist Activity Was Not Actually Litigated In The Asylum Proceeding.*

The second element of collateral estoppel requires the Court to determine whether Islam's terrorist activity was actually litigated in the earlier asylum proceeding.  "An issue is considered 'actually litigated' when the 'issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined.'"  *Cmty. State Bank v. Strong*, 651 F.3d 1241, 1267–68 (11th Cir. 2011) (quoting Restatement (Second) of Judgments § 27 cmt. d (Am. Law Inst. 1982)); *see In re Keaty*, 397 F.3d 264, 272 (5th Cir. 2015) ("The requirement that an issue be 'actually litigated' for collateral estoppel purposes simply requires that the issue is raised, contested by the parties, submitted for determination by the court, and determined.").  "Requiring

that issues be 'actually litigated' ensures that collateral estoppel precludes only those issues that were contested by the parties." *Strong*, 651 F.3d at 1268.

Here, the issue of whether Islam engaged in terrorist activity was not "actually litigated" during Islam's asylum proceeding. The undisputed record shows that the Immigration Judge did not consider whether the BNP was a terrorist organization or whether Islam was inadmissible for providing material support to the BNP. There is simply no evidence that either party raised or litigated the applicability of the terrorism bar at the asylum hearing. In fact, the parties did not raise the issue of Islam's inadmissibility in their briefs or closing arguments to the Immigration Judge. ECF No. [19-1] at 10 n.12. Therefore, the Court finds that the issue of whether Islam engaged in terrorist activity was not "actually litigated" for purposes of collateral estoppel during Islam's asylum proceeding.

In *Janjua*, a case similar to the instant matter, the plaintiff, a native and citizen of Pakistan, applied for asylum in the United States in 1999. 2017 WL 2876116, at *2. After some litigation, an immigration judge granted the plaintiff's asylum application in 2007. *Id*. A year later, plaintiff filed an application to adjust his status to legal permanent resident. *Id*. Plaintiff then initiated an action in 2015 because USCIS had not issued a decision on his pending application. *Id*. Eventually, USCIS denied plaintiff's adjustment of status petition because it concluded that plaintiff was inadmissible under INA section 212(a)(3)(B)(i)(I) for having engaged in terrorist activities. *Id*. According to USCIS, plaintiff provided material support to an undesignated terrorist organization when he "distributed flyers, organized meeting and rallies, hung posters, provided tent service for the [Muhajir Qaumi Movement ("MQM")], and started a new MQM office." *Id*. at *3. Notably, the court rejected plaintiff's argument that the issue of terrorist activity had been contested by the parties and submitted for determination by the immigration judge. *Id*. at *11.

14

The court concluded that while the government made a reference to MQM, it ultimately "never argued to the immigration judge that MQM was a terrorist organization; nor did [plaintiff] ever contend that MQM was not a terrorist organization." *Id*. Thus, the court found that the issue of terrorist activity was not actually litigated during plaintiff's asylum proceeding. *Id*.

Similarly, in another district court case, the court determined that the doctrine of collateral estoppel did not preclude USCIS from denying plaintiff's application for adjustment of status. *Ndom v. Nielsen*, No. 3:16-CV-3432-D, 2019 WL 339117, at *8 (N.D. Tex. Jan. 28, 2019). Specifically, the court held that as a matter of law "the issue of whether [plaintiff] 'engaged in terrorist activities' and was inadmissible under 8 U.S.C. § 1182(a)(3)(B)(i)(I) was not actually litigated, for purposes of collateral estoppel, during [plaintiff's] asylum proceedings." *Id*. In *Ndom*, plaintiff was from Senegal. *Id*. at *2. In 1998, plaintiff applied for asylum in the United States, and after extensive litigation, the BIA finally granted him asylum in 2005. *Id*. at *2–3. Plaintiff then filed an application to adjust his status to legal permanent resident in 2006. *Id*. at *3. More than ten years later, USCIS denied plaintiff's application based on evidence that he was a member of, and provided material support to, an undesignated terrorist organization under 8 U.S.C. § 1182(a)(3)(B)(vi)(III). *Id*. The court found that the issue of whether plaintiff had engaged in terrorist activities was not actually litigated because there was no indication in the record that plaintiff's activities involving the terrorist organization were contested or that the government previously took the position that plaintiff was inadmissible under § 1182. *Id*. at *7. Specifically, "none of the courts involved in [plaintiff's] asylum proceedings made any determination with respect to the question whether [plaintiff's] involvement with [the terrorist organization] rendered him inadmissible under § 1182." *Id*.

Islam relies on *Amrollah v. Napolitano*, 710 F.3d 568 (5th Cir. 2013) for support.   In *Amrollah*, plaintiff fled Iran in 1998 and applied for asylum in the United States.   710 F.3d at 570.   Plaintiff acknowledged in his application for asylum and during his asylum hearing that he had provided support for the Mujahedeen movement in Iran.   *Id*.   An immigration judge granted plaintiff's application for asylum in 1999.   *Id*. at 570.   And, a year later, plaintiff applied for an adjustment of status to permanent residence.   *Id*.   After several delays, the government denied plaintiff's application on the grounds that he had engaged in a terrorist activity, namely, his support for the mujahedeen movement in Iran.   *Id*.   The district court ruled that USCIS was not barred by collateral estoppel from denying plaintiff's application.   *Id*.   On appeal, plaintiff argued that the government should have been collaterally estopped from denying his application, because the immigration judge had already, and necessarily, determined that his support for the Mujahedeen movement did not constitute terrorist activity when he granted plaintiff's application for asylum.   *Id*. at 571.   The Fifth Circuit agreed.   *Id*.

Islam's reliance on *Amrollah* to support his argument that the issue of whether Islam engaged in terrorist activities was actually litigated is misplaced.   In *Amrollah*, "[t]he government cross-examined [the plaintiff] extensively about his support of the [M]ujahedeen movement . . . during the asylum proceeding."   710 F.3d at 571.   In addition, the immigration judge specifically concluded: "[a]lthough the Service attorney hints, or hinted that Respondent's support of the Mujahedeen indicated violent activity which might disqualify the Respondent from being eligible for asylum . . . Respondent's testimony showed he did not commit any violent act . . . ." *Id.* at 570 (internal quotations omitted).   Therefore, the immigration judge concluded plaintiff was eligible for asylum under 8 U.S.C. § 1158.   *Id*.   Unlike *Amrollah*, the question regarding Islam's inadmissibility under 8 U.S.C. § 1158 was never raised, contested by the parties, or submitted for

determination to the Immigration Judge, as is required to establish that the issue was "actually litigated" for collateral estoppel purposes.  As such, *Amrollah* is easily distinguishable from the case at hand.

The other case Islam relies on, *Islam v. U.S. Dep't of Homeland Sec.*, 136 F. Supp. 3d 1088, 1092 (N.D. Cal. 2015), is similarly distinguishable.  There, "[t]he DHS cross examined [the plaintiff] during his asylum hearing about his involvement in MQM-A and APMSO" and "[t]he DHS and [the plaintiff], during closing argument, each addressed whether [the plaintiff] was involved in terrorist activity."  *Islam*, 136 F. Supp. 3d at 1092.  As previously stated, no such examination or closing arguments were presented at Islam's asylum proceeding.

Accordingly, the Court is not persuaded by Islam's argument that *Amrollah* or *Islam* support a finding that the issue of whether Islam engaged in terrorist activity was "actually litigated" in the asylum proceeding.  The Court also rejects Islam's contention that the "actually litigated" element has been established because his membership in the BNP was clearly stated in his asylum application.  ECF No. [22] at 4.  Islam's argument is unavailing because the fact that Islam's membership in the BNP was mentioned in the asylum proceeding does not mean that the issue of terrorist activity was contested by the parties, submitted for determination, or determined by the Immigration Judge.  The Court finds that the issue of whether Islam engaged in terrorist activities, and therefore, inadmissible under 8 U.S.C. § 1182(a)(3)(B)(i)(I), was not "actually litigated" for purposes of collateral estoppel.

### 3.   *The Determination Of Whether Islam Engaged In Terrorist Activity Was A Critical And Necessary Part Of The Asylum Proceeding.*

The third element of collateral estoppel requires the Court to find that the issue of Islam's participation in terrorist activities was a critical and necessary part of the asylum proceeding.  "The 'necessarily decided' prong of the collateral estoppel test ensures that the prior court actually ruled

on the issue at hand." *Strong*, 651 F.3d at 1268. Indeed, "an issue is 'necessarily decided' when the prior court in fact 'resolved' it." *Id* at 1269.

Here, Islam has established that the Immigration Judge necessarily decided the issue of whether Islam had engaged in terrorist activity because the Immigration Judge could not have granted Islam asylum if the Immigration Judge determined that Islam had engaged in terrorist activity. *See Janjua*, 2017 WL 2876116, at *9. The court in *Janjua* addressed this exact issue and explained that:

> In the instant case, the immigration [judge] could not have reached a conclusion that asylum was appropriate for Mr. Janjua if the immigration judge determined that Mr. Janjua had in fact engaged in terrorist activity. *See Amrollah*, 710 F.3d at 572 (noting that "the immigration judge was *not permitted* to grant asylum to Amrollah if he satisfied any of the exceptions to admissibility under § 1182, including providing material support to any individual or organization that engaged in terrorist activities"; thus stating that "the IJ's ruling that Amrollah was admissible necessarily included, under the structure of the statute, a finding that Amrollah did not provide support to an individual or organization that engaged in terrorist activities") (emphasis in original). Therefore, contrary to what the government asserts, the immigration judge necessarily decided (even if only implicitly) that Mr. Janjua had not engaged in terrorist activity.

*Id*. Therefore, like the court in *Janjua*, this Court rejects Defendants' argument that Islam's inadmissibility was not necessarily considered by the Immigration Judge. Because the Immigration Judge was not permitted to grant asylum to Islam if he satisfied any of the exceptions to admissibility under § 1182—including the terrorist activity bar—the Immigration Judge's ruling necessarily included a finding that Islam did not provide support to an individual or organization that engaged in terrorist activities.

Although the Court finds that Islam has met the "necessarily decided" element of collateral estoppel, the Court notes that the "actually litigated" element remains unsatisfied. "Just because the issue was necessarily decided does not necessarily mean it was actually litigated under federal collateral estoppel." *Janjua*, 2017 WL 2876116, at *9; *see Ahmad v. Johnson*, No. 16-CV-01776-

JCS, 2017 WL 6945395, at *13 (N.D. Cal. Oct. 10, 2017) ("[W]hile the Court has no difficulty concluding that USCIS must have necessarily decided that Mr. Ahmad was not inadmissible on the basis of his involvement with MQM . . . The record of the prior proceeding does not include any briefing or arguments showing that these issues were actually contested . . . .").

### 4.   *The Party Against Whom Collateral Estoppel Is Asserted Must Have Had A Full And Fair Opportunity To Litigate The Issue.*

The fourth element of collateral estoppel requires the Court to determine whether Defendants had a full and fair opportunity to litigate the issue of Islam's terrorist activities. The parties do not offer any argument regarding this element of collateral estoppel. In fact, Islam claims that the parties agree that this element has been met, ECF No. [22] at 2, and Defendants do not dispute it. Irrespective of whether this prong was met, Islam's claim of collateral estoppel fails as a matter of law for the reasons already noted by the Court.

### C.   **The Denial Of Islam's Application to Adjust Status Was Not Arbitrary And Capricious.**

Having determined that the doctrine of collateral estoppel does not preclude USCIS from denying Islam's application for adjustment of status to legal permanent residence, the Court turns to Islam's claim that USCIS' denial of his application was arbitrary and capricious under the APA. Defendants contend that there is substantial evidence in the record showing that, during Islam's membership, BNP was a terrorist organization as defined in 8 U.S.C. § 1182(a)(3)(B)(vi)(III). ECF No. [19] at 20. Islam, however, contends that USCIS acted arbitrarily and capriciously in concluding that BNP met the Tier III criteria "because the BNP itself does not authorize and condone acts of violence by its members." ECF No. [22] at 4. According to Islam, whether the BNP leadership authorized or condoned violent acts is a genuine issue of material fact. *Id.* at 5.

Defendants' denial of Islam's adjustment of status application was not arbitrary and capricious because it was based on substantial evidence that BNP qualified as a Tier III terrorist organization during the time that Islam was affiliated with it.  It is undisputed that Islam was a member of the BNP from 1995 through 2015, and that Islam provided material support to the BNP from 1995 through 2011.  ECF No. [19-1] ¶ 14.  The assistance that Islam provided to the BNP, namely using Islam's tea shop as a BNP meeting place, passing out BNP flyers, and putting up posters of events sponsored by the BNP, falls within the definition of engaging in terrorist activities by providing material support.  Additionally, evidence from multiple publicly available sources demonstrated that members of the BNP frequently engaged in acts of violence since 1996.  ECF No. [18-2] at 30.  The violence engaged in by the members of the BNP resulted in death, injury, and significant property damage.  ECF No. [18-1] at 8.  Thus, USCIS' finding that Islam was inadmissible because he was a member of an undesignated terrorist organization is supported by substantial evidence and the undisputed facts.

Islam's argument that the BNP does not meet the Tier III criteria of an undesignated terrorist organization because the BNP itself does not authorize and condone acts of violence by its members is unavailing.  USCIS specifically found evidence that BNP leadership authorized terrorist activity committed by its members.  Specifically, there was no indication that the BNP leadership took steps to prevent this violence.  ECF No. [18-1] at 8.  In fact, persons in leadership positions in the BNP participated in or threatened the use of violence.  *Id*.  Even after considering Islam's argument that calling for protests is not equivalent to authorizing or condoning acts of violence, there is substantial evidence in the record that terroristic acts were authorized by BNP party leaders.  *See Uddin v. Attorney Gen. United States*, 870 F.3d 282, 292 (3d Cir. 2017) ("[E]vidence of authorization may be direct or circumstantial, and authorization may be reasonably

20

inferred from, among other things, the fact that most of an organization's members commit terrorist activity or from a failure of a group's leadership to condemn or curtail its members' terrorist acts.") (citations omitted).

Even if Islam is correct that "individual acts of violence by party members does not result in terrorist classification for the entire party," ECF No. [22] at 4, there is substantial and undisputed evidence in the record that terroristic acts were authorized by BNP party leaders.  Unlike *Uddin* where the immigration judge and Board of Immigration Appeals did not discuss whether the specified terrorist acts were actually authorized by the leadership, USCIS' decision here explicitly addressed the fact that "BNP's leadership has at least tacitly authorized violence by its members." ECF No. [18-1] at 8.  Consequently, USCIS' determination that Islam was inadmissible because BNP was a terrorist organization was not arbitrary and capricious.  Defendants are entitled to judgment as a matter of law.

### D.   The Tier III Undesignated Terrorist Statute Is Not Constitutionally Vague And Was Not Applied Over-Broadly To Islam's Case.

The Court next considers Islam's claim that the Tier III undesignated terrorist statute, 8 U.S.C. § 1182(a)(3)(B)(vi)(III), is impermissibly vague and overbroad.  Specifically, Islam argues[6] that the Tier III terrorist statute is void for vagueness and overboard because it fails to provide a person of ordinary intelligence fair notice of what is prohibited, and it authorizes and encourages seriously discriminatory enforcement contrary to the U.S. Supreme Court holding in *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  ECF No. [12] ¶¶ 12–13.  Defendants, however, contend that courts have addressed the breadth of INA's definition, finding the terrorist activity bar to be broad, but not unconstitutionally vague.  ECF No. [25] at 3.  Defendants also argue that

---

[6] Islam's Opposition to Defendants' Motion for Summary Judgment and Cross-Motion for Summary Judgment, ECF No. [22], did not include any factual or legal argument.  Instead, Islam incorporated "all arguments set forth in the Amended Complaint."  ECF No. [22] at 5.

the cases Plaintiff relied upon in administrative proceedings, did in fact apply the statute without finding that it was void for vagueness. *Id*. at 4. Finally, Defendants argue that the statue was not applied over-broadly to Islam. *Id*. at 3.

The Supreme Court has explained that a fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required. *Fox Television Stations, Inc.*, 567 U.S. at 253. "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *Id*. Laws that are impermissibly vague must be invalidated. *Id*. As the Supreme Court noted, "[a] conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Id*. The void for vagueness doctrine ensures that regulated parties know what is required of them, so they may act accordingly, and it provides the necessary precision and guidance, so that those enforcing the law do not act arbitrarily or discriminatorily. *Id*.

Islam's argument that the definition of a Tier III undesignated terrorist organization, as defined in 8 U.S.C. § 1182 (a)(3)(B)(vi)(III), is unconstitutionally vague is unavailing. The statute's definition of a "terrorist organization" includes "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv)." 8 U.S.C. § 1182(a)(3)(B)(vi)(III). Subclauses (I) through (VI) of clause (iv) list ways in which an individual or an organization can "engage in terrorist activity," which include committing, planning, soliciting funds for, soliciting individuals for, or providing material support for a terrorist activity. *Id.*

The Court disagrees that the definition of a Tier III undesignated terrorist organization is unconstitutionally vague.  As Defendants explained to Islam in their written decision, the definition of a Tier III undesignated terrorist organization is "reasonably straightforward."  ECF No. [18-1] at 9.  A person of ordinary intelligence would understand that the term "terrorist organization" means a subgroup of two or more individuals, whether organized or not, that engages in, or has a subgroup that engages in, certain defined terrorist activities.   Islam's purported confusion regarding the "group" or "subgroup" is meritless because the plain language of the statute narrowly defines a group as two or more individuals, whether organized or not, which engages in terrorist activity.  Therefore, Islam's vagueness challenge fails because the statutory terms in the definition of a Tier III undesignated terrorist organization are clear.

Islam's argument that under Defendant's interpretation of the definition of a Tier III undesignated terrorist organization a political party in the United States could qualify as a terrorist organization is equally unpersuasive.  As Defendants explain, other courts that have considered the definition of terrorist activity have rejected similar unconstitutionally vague challenges.  *See McAllister v. Attorney Gen. of U.S.*, 444 F.3d 178, 187 (3d Cir. 2006) (conceding that the definition of "terrorist activity" certainly encompasses more conduct than our society, and perhaps even Congress, has come to associate with traditional acts of terrorism, but nevertheless holding that the definition of "terrorist activity" is neither unconstitutionally overbroad nor vague); *Khan v. Holder*, 584 F.3d 773, 786 (9th Cir. 2009) (holding that the definition of terrorist activity is broad, but not unconstitutionally vague).  Accordingly, the Court finds that as a matter of law the definition of the Tier III undesignated terrorist statute, 8 U.S.C. § 1182(a)(3)(B)(vi)(III), is not constitutionally vague.

Finally, the Tier III undesignated terrorist statute was not applied overly-broad in this case. As previously discussed, the undisputed facts demonstrate that Islam was a member of the BNP, he provided material support to the BNP, and the BNP qualified as an undesignated terrorist organization because it was a group of two or more individuals which engaged in terrorist activity. Accordingly, the Tier III undesignated terrorist statute was not applied overly broad in this case.

### E.    Islam's Request For Oral Argument Is Denied.

Islam's request for a hearing on his Cross Motion for Summary Judgment, ECF No. [22], should be denied.  Pursuant to Local Rule 7.1(b)(2), "[t]he Court in its discretion *may* grant or deny a hearing as requested, upon consideration of both the request and any response thereto by an opposing party."  (emphasis added); *see also* Fed. R. Civ. P. 78(b) ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings.").  Here, the Court has benefitted from both parties' briefings and Islam has not adequately demonstrated why oral argument is necessary or why his written briefing is not sufficient.  Thus, Islam's request for oral argument should be denied.

## V.    RECOMMENDATION

Based on the foregoing, the undersigned respectfully **RECOMMENDS** that Defendants' Motion for Summary Judgment, ECF No. [19], be **GRANTED**, and Plaintiff's Cross Motion for Summary Judgment, ECF No. [22], be **DENIED**.  Plaintiff's request for oral hearing on the matter should also be **DENIED** because it is unnecessary.

## VI.    OBJECTIONS

Pursuant to Local Magistrate Rule 4(b) and Federal Rule of Civil Procedure 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge.  Failure to timely file objections shall bar the

parties from *de novo* determination by the District Judge of any factual or legal issue covered in the report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in this Report. 28 U.S.C. § 636(b)(1); 11th Cir. R. 3-1; *see, e.g.*, *Patton v. Rowell*, 678 F. App'x 898, 901 (11th Cir. 2017); *Cooley v. Comm'r of Soc. Sec.*, 671 F. App'x 767, 769 (11th Cir. 2016).

      **DONE AND SUBMITTED** in Chambers at Miami, Florida, this 15th day of May, 2019.

JACQUELINE BECERRA
United States Magistrate Judge